OPINION
{¶ 1} Plaintiffs-appellants, Gretchen Harden and Ralph Harden, appeal from a judgment of the Ohio Court of Claims in favor of defendant-appellee, University of Cincinnati Medical Center ("UCMC"), on plaintiffs' claims of medical malpractice, loss of consortium, and breach of contract.
 {¶ 2} In 1994, Dr. Harry vanLoveren, a neurosurgeon, diagnosed Gretchen Harden (individually, "plaintiff") with an aneurysm in the left internal carotid artery located in the cavernous sinus, an area of the brain behind the left eye. The aneurysm, a swelling or bulge in the wall of a blood vessel, initially was asymptomatic and was difficult to repair or remove surgically due to its location. Plaintiff did not require treatment until 1997, when she began to experience severe pain and double vision in the area of the aneurysm.
 {¶ 3} On July 16, 1997, Dr. vanLoveren admitted plaintiff, who was then 60 years old, to UCMC. Dr. vanLoveren referred plaintiff to Dr. Thomas Tomsick, an interventional radiologist at UCMC. Dr. Tomsick recommended that plaintiff undergo a balloon occlusion procedure that was being conducted on behalf of UCMC as part of his medical research study of cerebral aneurysms. In the procedure, small silicone balloons are placed in the carotid artery near an aneurysm and, upon their inflation and detachment, occlude, or block, the flow of blood to the aneurysm and prevent its rupture. Past studies had shown that an aneurysm could scar over and shrink down six months or so after a permanent balloon occlusion procedure.
 {¶ 4} After Dr. Tomsick explained the procedure, he presented a document entitled "Informed Consent Statement" for plaintiff's review and signature. Plaintiffs and Dr. Tomsick signed the informed consent statement for plaintiff to participate in the research study and have the permanent balloon occlusion procedure performed on plaintiff's left internal carotid artery.
 {¶ 5} Dr. Tomsick and his assistants performed the procedure on plaintiff on July 18, 1997. Four days after the procedure, plaintiff experienced sudden left side paralysis and changes in her pupils that indicated she suffered a stroke on the right side of her brain. An emergency angiogram revealed a large dissection, or tear, in plaintiff's right carotid artery, not the left carotid artery on which the procedure was performed, that nearly completely occluded the anterior circulation on the right side of her brain. Dr. vanLoveren's attempt to surgically bypass the occluded right carotid artery eventually failed, and plaintiff suffered permanent injuries from lack of sufficient blood flow to the brain. According to plaintiffs, plaintiff requires constant nursing care and will require nursing and medical care for the rest of her life.
 {¶ 6} On December 11, 1998, plaintiffs filed a medical malpractice action against Dr. Tomsick and UCMC alleging (1) Dr. Tomsick and his assistants rendered negligent medical care and treatment to plaintiff, (2) UCMC breached a contract with plaintiffs, as contained in the informed consent statement, to provide long-term health care to plaintiff for an indefinite period in exchange for plaintiff's participation in the research study, and (3) plaintiff's husband suffered a loss of consortium. After the court dismissed Dr. Tomsick from the action on the basis of civil immunity pursuant to R.C. 2743.02(F) and 9.86, the case proceeded against UCMC. The court conducted a three-day trial in the matter beginning on October 7, 2002.
 {¶ 7} At trial, Dr. Tomsick described how the balloon occlusion procedure was performed on plaintiff. Before placing and inflating the balloons in plaintiff's left internal carotid artery, Dr. Tomsick performed a diagnostic angiogram to determine if sufficient blood flowed through the cerebral arteries to supply circulation to the brain. The carotid artery and its internal branch provide anterior circulation to the brain, while the vertebral artery, located near the spinal column, supplies posterior circulation to the brain.
 {¶ 8} Dr. Tomsick first inserted sheaths into plaintiff's left and right femoral arteries in her groin area. A guide wire was inserted into the left femoral artery and threaded through the aorta up to the left carotid artery; a catheter was then advanced over the wire to the left arteries. Another guide wire and catheter were similarly threaded through the right femoral artery and positioned into the vessels on the right side of plaintiff's neck to study the collateral circulation on the right side of her brain.
 {¶ 9} Dr. Tomsick positioned a catheter into plaintiff's right internal carotid artery and injected contrast dye through the catheter into the blood vessel. With use of a fluoroscope and x-ray, the blood vessel then was evaluated to determine the nature and health of the vessel, including whether other aneurysms, disease processes, or dissections were present in the vessel that could impact blood circulation to the brain. The angiography showed the right carotid artery was open and had no dissections, but a small aneurysm was detected in the artery that previously had not been discovered. An angiography was then performed in plaintiff's common carotid artery and left carotid artery, which confirmed the presence of the large, previously diagnosed aneurysm in the left internal carotid artery. Notes of the procedure reflect that plaintiff's arteries were markedly tortuous, rather than smooth, in nature.
 {¶ 10} Dr. Tomsick next performed a temporary balloon occlusion test to make sure the brain had enough collateral circulation to adequately perfuse blood and oxygen to the entire brain even if the left internal carotid artery were occluded. For the temporary balloon occlusion test, a balloon was inflated at the site of the aneurysm in the left internal carotid artery. While the left carotid artery was temporarily occluded, a catheter was reinserted into plaintiff's right carotid artery, contrast dye again was injected, and the vessel and flow of blood through the artery were rechecked. Good blood flow again was demonstrated through the artery, and no dissections were shown as existing in the artery. The test then was performed in plaintiff's left and right vertebral arteries. No dissections were observed in the vertebral arteries, and plaintiff's collateral circulation was determined to be good. Performance of a hypotensive challenge test, to see if any symptoms developed when plaintiff's blood pressure was decreased, confirmed good collateral circulation in the brain.
 {¶ 11} Following the hypotensive challenge test, and while the balloon was still temporarily inflated, plaintiff underwent a single positive electron computed tomography, or SPECT study to verify that she had sufficient perfusion to both hemispheres of the brain from the right side during occlusion of the blood flow through the left internal carotid artery. The SPECT study confirmed good cerebral perfusion of the blood in the brain's hemispheres. With good collateral circulation having been demonstrated in the temporary balloon occlusion and SPECT tests, Dr. Tomsick proceeded with permanent balloon occlusion and released three inflated balloons in plaintiff's left internal carotid artery, permanently occluding the left anterior circulation in plaintiff's brain.
 {¶ 12} After permanently occluding the left internal carotid artery, Dr. Tomsick opted to perform an angiogram of plaintiff's right vertebral artery to see if other aneurysms existed in addition to the previously diagnosed aneurysm in the left internal carotid artery and the recently discovered aneurysm in the right internal carotid artery. The angiogram revealed that blood flow through the right vertebral artery was good, but that a dissection had occurred in that artery. A dissection is a tear or disruption in the inner lining of an artery. The experts in this case agreed that in the vast majority of the cases where a dissection occurs, the dissection is asymptomatic and heals on its own, but the possibility remains that a dissection can progress and cause partial or complete blockage of an artery.
 {¶ 13} Dr. Tomsick explained he did not perform a completion angiogram on the right internal carotid artery after permanent balloon occlusion because reinserting the guide wire and catheter into the right internal carotid artery to again examine the artery would have added a risk of further injury. Dr. Tomsick further explained the procedure would have produced no appreciable benefit where the artery had already been examined and good collateral flow had been demonstrated during the temporary balloon occlusion and SPECT tests. Instead, Dr. Tomsick chose to terminate the procedure, which lasted approximately eight hours, and plaintiff was transported to the Intensive Care Unit for monitoring during her recovery. Dr. Tomsick advised Dr. vanLoveren and plaintiff's family of the dissection in plaintiff's right vertebral artery.
 {¶ 14} Dr. Tomsick recorded the procedure with serial, photographic films taken during x-rays as contrast dye was injected into the various arterial areas; they were visually evaluated with the aid of a fluoroscope. The x-ray equipment was tied into a mainframe computer that contained a program for recording the x-ray images. The images were stored in the computer's memory, x-ray sheets would be made of the various "runs" and put into the patient's medical records, and the data that was in the mainframe would then be transferred to an optical disk, a special kind of CD-rom. Each "run" contained x-ray images filmed of a specific arterial area; when evaluation of one particular area was done, the "run" for that area would end and an evaluation and "run" of another area would be performed. The "runs" were numbered sequentially from 1 to 22, but the optical disk that contained the films of plaintiff's procedure showed runs numbered 8 and 21 as having no recorded images.
 {¶ 15} Dr. Tomsick testified that plaintiff was treated with Heparin, an anticoagulant, to inhibit the formation of blood clots around the area of the dissection, and she was also administered pain relievers and sedatives. Plaintiff underwent two more SPECT studies, on July 19 and July 21, which showed continued adequate perfusion to both hemispheres of her brain. Then, early in the morning of July 22, 1997, plaintiff suffered a sudden onset of symptoms of a stroke, which an emergency angiogram showed was caused by a large dissection in the right internal carotid artery that nearly completely occluded circulation through the artery.
 {¶ 16} On January 12, 2004, the trial court issued its decision and judgment entry in favor of UCMC on all of plaintiffs' claims. The court found (1) plaintiffs failed to prove UCMC's negligence in the care or treatment of plaintiff, (2) a contract did not exist between the parties that required UCMC to provide plaintiff with long-term care as contemplated by plaintiffs, and (3) because plaintiffs failed to prevail on their negligence or breach of contract claims, the claim for loss of consortium likewise failed. Plaintiffs appeal, assigning three errors:
FIRST ASSIGNMENT OF ERROR
The trial court committed error which was prejudicial to the plaintiff in basing its decision on matters not admitted into evidence.
SECOND ASSIGNMENT OF ERROR
The trial court committed error prejudicial to the plaintiffs when it ruled that the document identified as plaintiffs' exhibit no. 3 did not constitute a contract between the parties.
THIRD ASSIGNMENT OF ERROR
In its decision and order finding in favor of defendants as to all issues, the trial court committed error prejudicial to the plaintiffs in that such determinations and findings are against the manifest weight of the evidence that was presented.
 {¶ 17} We first discuss plaintiffs' second assignment of error that asserts the trial court erred in finding plaintiffs had no cause of action for breach of contract based upon language contained in the "Informed Consent Statement."
 {¶ 18} The "Informed Consent Statement" Dr. Tomsick gave to plaintiff discloses information regarding the purpose of the medical research study plaintiff was invited to participate in, what the balloon occlusion procedure was designed to accomplish, the nature and steps of the procedure, the risks and concerns associated with the procedure, and alternative available treatments. Ohio law requires the disclosure of such information to a patient. See R.C. 2317.54; Nickell v. Gonzalez (1985),17 Ohio St.3d 136, 139; Siegel v. Mt. Sinai Hosp. of Cleveland
(1978), 62 Ohio App.2d 12, 21; Wheeler v. Wise (1999),133 Ohio App.3d 564, discretionary appeal not allowed, 86 Ohio St.3d 1492. Plaintiff signed the document, agreeing to participate in the medical research study in exchange for treatment of her cerebral aneurysm with the balloon occlusion procedure.
 {¶ 19} In support of their breach of contract claim, plaintiffs rely on language in the informed consent statement that states: "Participation in the study will include one year of follow-up, although long-term care will be offered for anindefinite period." (Emphasis added; Informed Consent Statement, 1.) Plaintiffs argue that the foregoing language constitutes UCMC's promise to provide long-term care to plaintiff indefinitely, and UCMC's refusal to provide for all of plaintiff's medical care for the rest of her life is a breach of such promise and a breach of the parties' contract.
 {¶ 20} A contract is "[a] promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty." EpiscopalRetirement Homes, Inc. v. Ohio Dept. of Indus. Relations (1991),61 Ohio St.3d 366, 369, quoting The Restatement of the Law 2d, Contracts (1981) 5, Section 1. In order for a party to be bound to a contract, the party must consent to its terms, there must be a meeting of the minds of both parties, and the contract must be definite and certain. Id.
 {¶ 21} The construction of a written contract is a matter of law that we review de novo. Saunders v. Mortensen,101 Ohio St.3d 86, 2004-Ohio-24, at ¶ 9; Alexander v. Buckeye Pipe LineCo. (1978), 53 Ohio St.2d 241, paragraph one of the syllabus. A court's primary role when construing a written contract is to ascertain and give effect to the intent of the parties.Saunders, supra. The intent of the parties to a contract is presumed to reside in the language employed in the agreement. Id.; DiMarco v. Shay, 154 Ohio App.3d 141, 2003-Ohio-4685, at ¶20. Words will be given their ordinary meaning in a contract unless manifest absurdity results or some other meaning is clearly evident from the face or overall contents of the document. Shifrin v. Forest City Enterprises, Inc. (1992),64 Ohio St.3d 635, 638; Buckeye Pipe Line, at paragraph two of the syllabus. The writing will be read as a whole, and the intent of each party will be discerned from a consideration of the whole.Foster Wheeler Enviresponse, Inc. v. Franklin Cty. ConventionFacilities Auth. (1997), 78 Ohio St.3d 353, 361. Where the language of a contract is subject to two constructions, the reasonable and probable construction is preferred. Graham v.Drydock Coal Co. (1996), 76 Ohio St.3d 311, 316; Butler-Peak v.Cunningham (2000), 138 Ohio App.3d 334, 340.
 {¶ 22} Construing the informed consent statement as a whole and applying the ordinary meaning to the language employed in the document, we conclude the document at issue serves merely as written notice that plaintiff gave her informed consent to participate in the medical research study and have the balloon occlusion procedure performed on her cerebral aneurysm. Nevertheless, even if we were to assume, without so deciding, that the document constitutes a contract based on plaintiff's agreement to participate in the research study in exchange for treatment of her aneurysm with the balloon occlusion procedure, we further conclude the language of the contract does not reasonably evidence that UCMC agreed to provide for all of plaintiff's medical care for the rest of her life.
 {¶ 23} The informed consent statement informs patients that "[p]articipation in the study will include one year of follow-up," consisting of a clinical follow-up and skull x-rays performed at four weeks, six months, and one year, and an MRI/MRA examination at the end of one year to confirm shrinkage of the aneurysm. The document explains that "[f]ollow-up examinations are helpful in determining the extent of repair achieved with the balloon as well as aiding in identification of symptoms should [the patient's] condition recur." (Informed Consent Statement, 2.) In other words, follow-up is provided to track the status of the treated aneurysm for a one-year period.
 {¶ 24} While the document states long-term care "will be offered for an indefinite period," plaintiffs' construction is unreasonable in light of other language in the informed consent statement that specifically advises patients that the "University of Cincinnati Medical Center follows a policy of making all decisions concerning compensation in medical treatment for injuries occurring during or caused by participation in biomedical or behavioral research on an individual basis." The language further advises that "[f]unds are not available to cover the cost of any ongoing medical care." (Informed Consent Statement, 4.) The language plaintiffs rely upon merely reflects UCMC's intent to offer plaintiff an opportunity for continued follow-up of her treated aneurysm for some undetermined length of time.
 {¶ 25} The trial court did not err in concluding that plaintiffs had no viable action for breach of contract, and plaintiffs' second assignment of error accordingly is overruled.
 {¶ 26} In their first assignment of error, plaintiffs assert the trial court erred in finding, contrary to the testimony of plaintiff's expert witness, neuroradiologist Dr. Gerard DeBrun, that the standard of care did not require Dr. Tomsick to do a "completion angiogram" on plaintiff to ensure adequate blood flow through the right internal carotid artery after permanent balloon occlusion was completed on her left internal carotid artery. A "completion angiogram" in this case means the physician goes back and checks the posterior circulation in the left and right vertebral arteries and the anterior circulation in the right carotid artery after the balloons are permanently placed occluding the anterior circulation in the left carotid artery.
 {¶ 27} Plaintiffs contend that in making its finding regarding the applicable standard of care, the trial court erroneously determined that Dr. DeBrun's expert testimony constituted his "own personal standard" of care, rather than the appropriate, legal standard of care for interventional neuroradiologists performing the balloon occlusion procedure. Plaintiffs argue the trial court misconstrued Dr. DeBrun's testimony on cross-examination and improperly considered material that is not part of the record.
 {¶ 28} During cross-examination, Dr. DeBrun agreed to differences among practitioners about how best to perform the balloon occlusion procedure, including practitioners' use of different techniques for evaluating the adequacy of contralateral flow during temporary occlusion. Dr. DeBrun testified he would nevertheless "blame" other practitioners if they performed a SPECT study without also performing a contrast study and would "consider it to be below standard of care." (Tr. 181.) Defense counsel then questioned Dr. DeBrun as follows:
Q. Is the standard of care just the way you do it, or is it the way ordinary and reasonable physicians do it?
[PLAINTIFFS' COUNSEL]: Objection, Your Honor. Argumentative.
THE COURT: Sustained.
[DEFENSE COUNSEL]: I think — excuse me, Your Honor.
Q. When you use the term standard of care what do you mean by it, doctor?
A. What I do in the best interest of the patient.
(Emphasis added; Tr. 181-182.)
 {¶ 29} Plaintiffs assert that in evaluating Dr. DeBrun's understanding of "standard of care," defense counsel's first question to Dr. DeBrun cannot be considered because the objection to the question was sustained. Plaintiffs contend that Dr. DeBrun's further testimony that the term standard of care means what he does in the best interest of a patient exemplifies the appropriate standard of care, given Dr. DeBrun's stature as a preeminent expert in this specialized area of medicine, including his having invented the balloon occlusion procedure.
 {¶ 30} Bruni v. Tatsumi (1976), 46 Ohio St.2d 127, 129-130, defined "standard of care," stating "the test is whether the physician, in the performance of his service, either did some particular thing or things that physicians and surgeons, in that medical community, of ordinary skill, care and diligence would not have done under the same or similar circumstances, or failed or omitted to do some particular thing or things which physicians and surgeons of ordinary skill, care and diligence would have done under the same or similar circumstances. He is required to exercise the average degree of skill, care and diligence exercised by members of the same medical specialty community in similar situations." The record here supports the trial court's conclusion that Dr. DeBrun testified to his own, personal standard of care rather than the standard of care enunciated inBruni, which the trial court correctly recognized is the appropriate standard of care in this case.
 {¶ 31} On direct and cross-examination, Dr. DeBrun acknowledged that other practitioners may perform techniques and procedures differently than he does. However, his testimony consistently reflects that he considered his own protocol to constitute "the" standard of care and that any deviation from his protocol fell below the "standard of care." Further, Dr. DeBrun seemed to equate "standard of care" with the highest, or virtually perfect, standard of care in a given situation, rather than the standard enunciated in Bruni, which is premised on what a medical professional of "average" degree of skill, care and diligence in the same medical specialty would do in similar circumstances. Id. at 130. As an example, while Dr. DeBrun testified that an arterial dissection is a known risk of angiography and can happen even in the exercise of reasonable caution by a skilled physician performing a cerebral arteriogram, he also testified that he considers it to be a mistake and below the "standard of care" if he creates a dissection.
 {¶ 32} Because Dr. DeBrun's testimony supports the trial court's observation that the standard of care Dr. DeBrun referred to in his testimony was his own personal standard rather than the standard of care set forth in Bruni, plaintiffs' first assignment of error is overruled.
 {¶ 33} In their third assignment of error, plaintiffs assert that certain findings of the trial court were against the manifest weight of the evidence. Specifically, plaintiffs challenge the trial court's findings that: (1) the standard of care does not require a completion angiogram to be performed after permanent balloon occlusion, (2) plaintiffs did not prove that x-ray images were made, and then deleted by UCMC, that would have shown an injury to plaintiff's right internal carotid artery at the time the balloon occlusion procedure was performed, and (3) the informed consent statement does not constitute a binding contract obligating UCMC to provide long-term medical care to plaintiff for the rest of her life.
 {¶ 34} "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." C.E. Morris Co. v. Foley Constr. Co.
(1978), 54 Ohio St.2d 279, syllabus. We afford every reasonable presumption in favor of the trial court's judgment and findings of fact, and evidence susceptible of more than one interpretation is construed consistently with the trial court's judgment.Gerijo, Inc. v. Fairfield (1994), 70 Ohio St.3d 223, 226, certiorari denied (1995), 513 U.S. 1150, 115 S.Ct. 1101.
 {¶ 35} Regarding the first finding at issue, plaintiffs' experts, Dr. DeBrun and Dr. Robert Rand, a board-certified neurosurgeon, testified at trial that the standard of care obligated Dr. Tomsick to perform a "completion angiogram" after permanent balloon occlusion in order to check for dissection in plaintiff's vessels, specifically the right internal carotid artery. Dr. DeBrun acknowledged a right internal carotid artery dissection was not evidenced on any of numerous films taken of the area prior to permanent occlusion, and conceded nothing in plaintiff's medical records or in observations of her condition suggested the second dissection occurred prior to the stroke plaintiff experienced on July 22, 1997, which Dr. DeBrun characterized as a "sudden onset event."
 {¶ 36} Dr. DeBrun maintained, however, that dissection does not happen spontaneously, and that the dissection in the right internal carotid artery must have occurred at some point during the balloon occlusion procedure. Dr. DeBrun opined that the dissection probably occurred as the result of manipulation of the guide wire or the catheter, and that plaintiff's history of cigarette smoking may have been an aggravating factor in causing the vessel damage. Dr. DeBrun testified a chance for injury to the interior of a blood vessel always exists with each pass of a guide wire or catheter through the vessel, and he stated that tortuous vessels increase the risk of injury. Nevertheless, he and Dr. Rand opined that after plaintiff's left internal artery was permanently blocked with balloons to prevent rupture of plaintiff's aneurysm, the risk of injury to the right carotid artery by reinserting the guide wire and catheter and re-injecting dye into that vessel was outweighed by the need to verify that plaintiff's remaining carotid artery was uninjured and had good blood flow.
 {¶ 37} UCMC presented the expert testimony of Dr. Many Jensen, an interventional radiologist, and Dr. Thomas Flynn, a board-certified neurosurgeon. In contrast to Dr. DeBrun's and Dr. Rand's opinions, UCMC's experts opined that the standard of care did not require Dr. Tomsick to perform a completion angiogram after permanent occlusion took place. Dr. Jensen testified that the accepted standard of care is to check the adequacy of collateral circulation during the temporary balloon occlusion and, if the circulation provides adequate perfusion to the brain, to detach the balloons and end the procedure. Dr. Jensen stated that Dr. Tomsick not only met the standard of care, but he did some "extra" things during temporary balloon occlusion by performing the hypotensive challenge test, conducting contrast dye injection tests on plaintiff's right side, performing the SPECT study to confirm adequate blood flow, and performing a neurological assessment of the patient.
 {¶ 38} According to Dr. Jensen, dissections can begin very slowly and develop over time, and an injury to the lining of a blood vessel may be initially undetectable. Dr. Jensen testified that the films taken during temporary balloon occlusion showed equal and adequate blood flow to the anterior and posterior portions of plaintiff's brain and no obstruction of flow on plaintiff's right side, despite the small dissection detected in plaintiff's right vertebral artery. Dr. Jensen testified, and plaintiff's expert Dr. DeBrun agreed, that after Dr. Tomsick recognized the dissection in the right vertebral artery, Dr. Tomsick responded appropriately and within the accepted standard of care by placing plaintiff on an anticoagulant and by ordering repeated SPECT scans, which verified blood perfusion to both hemispheres of the brain. Drs. Jensen and DeBrun were in further agreement that whether there was one dissection or two, the anticoagulation therapy remains the same. Dr. Jenson opined that since the presence of a second dissection might be undetectable, and adequate perfusion had been documented during the temporary occlusion of plaintiff's left carotid artery, it was unnecessary to recheck plaintiff's collateral perfusion after permanent occlusion; that to do so would pose a needless risk to the patient without appreciable benefit. Drs. Jenson and Flynn, like Dr. DeBrun, testified that plaintiff did not display signs of insufficient cerebral blood flow prior to the sudden onset of the stroke symptoms on July 22.
 {¶ 39} Accordingly, the record, and in particular the testimony of UCMC's expert witnesses, provides substantial, credible evidence to support the trial court's finding that the applicable standard of care did not require that Dr. Tomsick perform a completion angiogram after permanent balloon occlusion.
 {¶ 40} Plaintiffs next challenge the trial court's finding regarding the x-ray images for "Run 21" that are missing from the optical disk containing the set of x-ray images taken during plaintiff's balloon occlusion procedure. Referencing testimony of UCMC's former radiologist technician "that there was no practical way to delete runs or individual images from the computer or the optical disk," the trial court determined plaintiffs failed to prove that the alleged images were actually attempted or captured on film, or that the absence of the images created a negative inference with respect to UCMC's liability. Plaintiffs assert that, contrary to the trial court's finding, other trial testimony the technician presented raises an inference that the x-ray images taken in "Run 21" may have been deleted because they showed evidence of injury to the right internal carotid artery that Dr. Tomsick missed when he performed the balloon occlusion procedure.
 {¶ 41} Stuart Ludy, the technician who operated the equipment that recorded x-ray images taken during plaintiff's balloon occlusion procedure, testified that the practice was to transfer images from the mainframe to an optical disk the same day the procedure was performed. As to why a run on an optical disk might contain no images, Ludy explained that on occasion he would not transfer images from the mainframe to the optical disk if the images were blurry or blank due to movement by a patient or a lack of contrast dye to create an image. According to Ludy, he noticed when filming this case that images for the runs in question were not there; he denied that Dr. Tomsick asked him to delete any images. Ludy stated that individual images could be deleted from the mainframe; after the initial transfers onto the disk were made, however, they could not be deleted from the optical disk without deleting the rest of the images on the optical disk, which typically contained films for several patients. Moreover, contrary to plaintiffs' suggestion, other competent evidence at trial indicates that "Run 21" did not even involve the right internal carotid artery.
 {¶ 42} Because the trial court's findings regarding missing x-ray images of plaintiff's balloon occlusion procedure are supported by competent, credible evidence, they are not against the manifest weight of the evidence.
 {¶ 43} Finally, plaintiffs assert the manifest weight of the evidence does not support the trial court's finding that UCMC is not contractually obligated to provide longterm care to plaintiff as plaintiffs contemplated. Because this issue has been decided in our resolution of plaintiffs' second assignment of error, we decline to address it again. Accordingly, plaintiffs' third assignment of error is overruled.
 {¶ 44} Having overruled all three of plaintiffs' assignments of error, we affirm the judgment of the trial court.
Judgment affirmed.
Bowman and Deshler, JJ., concur.
Deshler, J., retired, of the Tenth Appellate District, assigned to active duty under authority of Section 6(C), Article IV, Ohio Constitution.